THE HOWE SCALE COMPANY *v.* FRANCIS E. TERRY AND GEORGE
WARD.

*Water Privilege.    Construction of Grant.    Liability of Tenant
in Common of Water Power to Co-tenant.*

Covenant, that "in case there is not at any time a full supply of water for the simul-
taneous operations of the works connected with the dam, the grist-mill shall draw
its requisite quantity of water, exclusive of all other works." *Held*, that the grist-
mill right was not merely a right to use the water exclusively in the manner and
for the time it was then accustomed to be used; but a right to use the water in
*quantity* as then used, and for such length of time during the season of scarcity as
the custom and business of the mill might require; and that if the work done in
six hours by the wheel substituted for the one in the mill when the covenant was
made, was as much as that done by the latter in twenty-four hours, and with the
use of less water, there would seem to be no breach of covenant, provided the busi-
ness done was the same in character as that being done when the covenant was
made.

At the time the defendants purchased said grist-mill, the flume and wheel that had
been used to operate the plaintiff's machine shop on the opposite side of the
stream, had rotted away, and could not be used. The defendants operated said
grist-mill as it ever had been operated, and with proper care, and used water which
otherwise could be used by no one. The plaintiff had no flume, wheel, or other
appliance by which the water could be used, and gave the defendants no notice
that in grinding at their mill they were working injury to the plaintiff, or that the
plaintiff purposed or desired to rebuild its works and use the water. The decla-
ration alleged that the defendants had used the water so as wrongfully to deprive
the plaintiff of the use thereof to *operate the wheel of said machine shop. Held,*
that the defendants, by continuing the use of their grist-mill in the ordinary man-
ner, without notice from the plaintiff as aforesaid, were guilty of no actionable
wrong to the plaintiff.

*Held*, that if the defendants should use the whole water of the stream, when the
plaintiff had no machinery or provision for its use, such use would be presumed to
be with the consent and for the benefit of all.

CASE for diverting water from the plaintiff's machine shop in
the village of Brandon. Plea, the general issue, and trial by
jury, and verdict for the plaintiff for $500 damages, September
term, 1871, Rutland county, WHEELER, J., presiding.

The declaration alleged that the plaintiff was possessed of a
certain machine shop and water wheels, with the appurtenances, and
that the defendants drew the water " so as unlawfully to deprive
the plaintiff of the use of the water from said dam to operate
plaintiff's wheel to said machine shop," * * * " by reason whereof
the plaintiff has been deprived of the use and benefit of the water

of said dam to operate its said wheel and the machinery connected therewith, and has thereby wholly lost the use and benefit of said shop and machinery, when by having the use thereof, the plaintiff would have made great gains," &c.

On the 1st of March, 1823, John Conant, then owner in fee of the water privilege and dam at the falls on Brandon River, in said village, and also of the lands and buildings on both banks of the stream at that place, sold and conveyed to his two sons, John A. and Chauncey W., two undivided thirds of the land on the east side of the center of said stream, with the buildings thereon, and " a privilege of water from my pond, sufficient, when carefully used without waste, to carry a blast furnace and pounding machine when, and at all times when, it shall be wanted for said use, and for no other purpose ; also, a privilege of water as aforesaid, sufficient to carry a pocket furnace and drilling machine, or other machinery necessary for a finishing shop, at all times when it shall not be wanted for any other works on those falls, or to the injury of them, or any other privilege I have heretofore sold." At the time of this conveyance there was, and for some years previously had been, upon the premises so conveyed, a blast furnace and a pot furnace, which were worked and operated by water taken from the pond formed by said dam—the water used by these furnaces being taken to both from the pond, through the same channel or flume. There were, also, some other buildings standing on said land, but none which required water power. On the west side of said stream was a grist-mill belonging to the said John Conant, which was also run and operated by water taken from the west side of the same pond. John Conant continued to be the owner in severalty of the grist-mill property, until March 2, 1852, when he sold and conveyed it ; and the title thereto, through several intermediate conveyances, was legally vested in the defendants on the 31st of March, 1866. After said conveyance from John Conant to his sons, the title to the land, furnaces, and works on the east side of said falls, continued in the three as tenants in common, until June 2, 1852, when they sold and conveyed the whole of said property on the east side of the stream, to John Howe, Jr., John H. Blake, and Franklin Darricott, who, on the 7th Jan-

uary, 1853, conveyed the same by deed to the Brandon Iron and Car-Wheel Company. · In support of plaintiff's title to the land and works on the east side of the stream, the plaintiff introduced a deed from John Howe, Jr., to the plaintiff, dated April 18, 1864; also, a deed dated October 16, 1860, executed by E. N. Briggs, as agent of the Brandon Iron and Car-Wheel Company, to John Howe, Jr.; but there was no evidence except the recitals in the said last mentioned deed, tending to show any authority in Briggs to execute said deed; nor was there any evidence relative to the existence or character of said company, or to the manner of its formation or organization.

In 1835, the three Conants erected upon the land so owned by them as tenants in common, a brick building, to be used principally in the finishing of stoves manufactured by them, and, to some extent, as a machine-shop, which was located just below said dam, and between it and the blast furnace, and it was furnished with the requisite machinery for the business for which it was intended. . This brick building has ever since been called the " Machine Shop," and the water used in operating it passed through a canal provided for that purpose, directly from the machine-shop to the blast furnace, so long as it was in operation. In 1840, John Conant built a new grist-mill on the west side of the stream, just below the old one, and the latter has never since been used as a grist-mill, nor, for many years, for any business requiring water power.

On the 8th April, 1841, the three Conants executed an indenture, specifying and defining the water rights as between the various works on both sides of the stream at said falls, whereby they covenanted that " all the respective gates of said dam are to draw water on a level with, and no lower than, the gate which now lets the water on the overshot wheel of John Conant's new grist-mill; and in case there is not at any time a full supply of water for the simultaneous operations of the works connected with said dam requiring water power, the blast furnace, during the blast, shall draw its requisite quantity of water, exclusive of all the other works; and in a like instance the new grist-mill shall be the next entitled to the same privilege; and the next in

order entitled to the same preference, shall be the pot-furnace; but on the contrary, at such times as there may be a full supply, then all shall be entitled alike to the portion respectively requisite in all instances and at all times; the portion of water directed to the use of the blast and pot furnaces, may be applied and used on its passage, to propel the wheel in the machine shop adjacent to said dam, and thence conveyed to the use of both or either of said furnaces;" which indenture has always been recognized by the various proprietors of the mills, as defining and controlling their respective rights and privileges in the water at that place. At or about the same time, the flume on the east side of the stream, through which the water was taken for the propulsion of the machinery in said machine-shop, and for running the furnaces, was so modified and adjusted that the water was taken from the pond on the same level as that which furnished power for the grist-mill. In the fall of 1859, the water wheel which drove the machinery in the grist-mill having become old and defective, and the mode of its connection with the machinery being such as to cause considerable unnecessary waste of power, and the grist-mill flume having also become very much decayed, Jackson & Nearing, who were then the owners of the grist-mill and of all the water rights appurtenant thereto, as defined by said deed from John Conant to his sons, and by the said indenture, removed the old wheel, which was an overshot wheel, and put in as substitutes, four iron turbine wheels, known as Tyler wheels. These wheels are a modern invention, are in quite general use, and have, to a very considerable extent, supplanted the overshot wheel. At the same time, the said Jackson & Nearing built a new flume to convey the water to the new wheels, adjusting it in such a manner as to convey the water to the wheels without unnecessary waste, although in a manner different from that in which the water had been carried upon the old wheel. Ever since the erection of the new grist-mill, it has been used and operated in the ordinary way of using and operating such mills—the business done thereat having, during that time, very much increased—and the mill was so used and operated by the defendants from the time of the conveyance to them on the 31st March,

1866, until the commencement of this suit, 8th December, 1866, no objection being made thereto by any one, and no evidence tending to show any negligence or improper management on the part of the defendants during that time, was introduced.

Many years ago, but at what exact time it did not appear, another dam was constructed in said stream, about fifteen rods below the dam first above mentioned, since which the use of water from the upper dam for propelling the machinery in the pot-furnace, has been wholly discontinued, and water for that purpose has been taken from the lower pond exclusively. The business at the blast-furnace was wholly discontinued in 1860, or shortly before, and the building used for that purpose was soon afterwards removed.

The testimony on the part of the plaintiff tended to show, that at the time Jackson & Nearing put in the new wheels and flume as before stated, they lowered the bottom of the aperture in the dam through which the water passed from the pond to the grist-mill, considerably below where it had formerly been, and that the quantity of water required to operate the grist-mill with the new wheels put in by Jackson & Nearing, was considerably greater than was required for that purpose by the old wheel; also, that from the time the machine-shop was erected in 1835, and more especially from about 1847, it was used to a very considerable extent as a machine-shop, until the business was discontinued as hereinafter stated; that during that time a considerable quantity of machinery and several hands were employed therein, and that there was, ordinarily, a sufficient supply of water in the pond to propel all the machinery in the machine-shop, so that its business was only occasionally, and but for short periods, suspended for want of water; that from about 1858, until the removal of the machinery as hereinafter stated, the plaintiff occupied the said machine-shop for the manufacture or finishing up of scales, using the water as before stated; that said change of wheels and flumes at the grist-mill, drew the water of the stream away from the machine-shop, and produced a perceptible effect upon the supply of water thereat, rendering it wholly impracticable, by reason of

the increased quantity of water used at the grist-mill, to operate the machine-shop to advantage, or for any considerable portion of the time ; that the plaintiff was thereby compelled to, and did, in the spring or summer of 1860, wholly discontinue the use of machinery in the machine-shop, and removed the machinery therefrom ; that this increased use of the water at the grist-mill, and this effect upon the supply of water to said machine-shop, had continued ever since, and that the use of the water so drawn away would have been worth a thousand to twelve hundred dollars per year to the plaintiff ; and that the plaintiff continued in possession of the machine-shop premises, until after the commencement of this suit, but did not use the water of the stream except as before stated.

The testimony on the part of the defendants tended to show, that the new flume constructed by Jackson & Nearing as aforesaid, was inserted into the dam at precisely the same altitude, and that the aperture through which the water was taken into it from the pond, was exactly of the same dimensions, and at precisely the same place, as the one through which the water passed into the old flume ; that the Tyler wheel is a great improvement on the old-fashioned overshot wheel, as well on account of the much greater amount of service which it will perform, as of the saving of water ; and that since its introduction into use, some years previous to the time when these wheels were put into said grist-mill, it had driven out and taken the place of the overshot wheel to a very general extent throughout the country ; that although when all the stones in the defendants' grist-mill were running with those wheels, more water was required than would be required to run the overshot wheel, the Tyler wheels would grind more than four times as much grain in a given period as could be ground with an overshot wheel, and that consequently the quantity of water required to do the business of that mill with the new wheels, was considerably less than would have been required by an overshot wheel ; that in point of fact the supply of water for running the machine shop, was not diminished nor injuriously affected by the substitution of the Tyler wheels for the overshot wheel at the grist-mill, nor by the construction of the

new flume by Jackson & Nearing as aforesaid; and that the plaintiff ceased using the machine-shop, and removed the machinery therefrom, before said change of wheels at the grist-mill was made.

It was conceded that several years prior to the time the defendants acquired their title to the grist-mill property and took possession thereof, the flume which had formerly taken the water from the pond to the wheel which carried the machinery in the machine shop, and thence to the blast-furnace, had gone to decay and become wholly unfit for use; that the wheel itself had also rotted and fallen down or been removed; and that no machinery had been in the machine-shop since it was removed therefrom as before stated. On the point of the plaintiff's title, no evidence was introduced except what is hereinbefore stated.

The defendants requested the court to instruct the jury:

1. " No title in the plaintiff to the machine-shop is shown; the evidence does not show nor tend to show that Briggs had authority to execute the deed from the Brandon Iron and Car-Wheel Company to Howe.

2. " Neither the deed nor the contract of April 8, 1841, convey any right to the use of water for running a machine-shop, except by using the water when running to the furnaces, or one of them; and that having been discontinued long before the injury complained of, the plaintiff had no right whatever to the use of the water to operate the machine-shop at the time the defendants were in possession of the grist-mill.

3. " Whether standing upon the express stipulations contained in the contract of April 8, 1841, or upon the long continued use of the water by the defendants' predecessors, the right of the defendants to draw all the water necessary for propelling the grist-mill, from the place where it was drawn at the date of the contract, is unquestionable.

4. " In no event, therefore, can the plaintiff recover without affirmative proof that the defendants drew water from a lower point in the dam than the point from which it was drawn at the date of the contract.

5. " As respects the quantity of water which the defendants had a right to use, it was limited only by the necessities of the business of their mill; and there was no limit to the amount of business for which they had a right to draw water from the dam, so long as the business was confined to the class or kind specified

in the contract, or embraced in the previous user of their predecessors.

6. " In the exercise of their right to draw water for the propulsion of their grist-mill machinery, the defendants were not restricted to any particular time ; but as long as their business was conducted in the usual manner, and with reasonable and proper care and prudence, they had a right to select their own time for doing it, and to employ such machinery as they saw fit.

7. " The defendants were under no contract or other obligation to use the water after it left the pond, in any particular manner for the running of their mill, but had a right to apply it for the purpose intended, in such a manner as they deemed proper, provided, that in so doing, they were not wanting in ordinary care and prudence.

8. " As the plaintiff made no effort to use the water while the defendants were in possession of the grist-mill, nor made any objection to the use of it by the defendants as it was used by them, and had no wheel, machinery, or other facilities for using it, the defendants are not liable.

9. " But if they could be made liable under a proper declaration, they are not under the present one, which goes only for a diversion of the water from the plaintiff's wheel and machinery at the machine-shop, neither of which existed at the time of the alleged diversion, nor for a long time previously."

But the court, except as hereinafter stated, declined to so charge, and instructed the jury, among other things, as follows :

"The deed of March 1, 1823, from John Conant to John A. and Chauncey W. Conant, conveyed to the grantees two-thirds of a right to draw water from the pond sufficient to carry a pocket furnace and drilling machine, or other machinery necessary for a finishing shop, when not wanted for other works of the grantor, and when not to the injury of other works or privileges previously conveyed by him.   The mention in this deed of the uses to which the water was to be put by the parties, is not a limitation of the use of the water to the particular kinds of business mentioned in the deeds, but is to be treated as measuring the quantity of water to be used.   The agreement of April 8, 1841, was equivalent to a conveyance by each of the parties to the others, of a right sufficient to make the rights of each equal to the specifications of rights contained in the agreement ; and these specifications are to be applied to things as they existed at that time, and are to be construed with reference thereto.

" The agreement gave the blast furnace the preference during a blast, but not while there was no blast, and that the plaintiff had shown no right to claim 'that preference during the time covered by the declaration. When the blast furnace was not in blast, the grist-mill had a right to a full supply of water reasonably requisite to run the mill as it was at the time the agreement of April 8, 1841, was made, at all stages of the water, without unnecessary waste, and without drawing it any lower than the gate to the grist-mill then was; and this preference of the grist-mill existed during the time covered by the declaration. After the grist-mill, the machine-shop and furnaces had the right to all the water not requisite for a full supply for the grist-mill, up to a full supply reasonably requisite to run them as they were at the date of said contract, without unnecessary use or waste, and without drawing it any lower than the grist-mill gate. Upon the evidence, the whole grist-mill right was vested in the defendants by the convey-ance to them, and the court, *pro forma*, for the purposes of this trial, rules that the whole machine-shop and furnace rights to the use of water, passed to the plaintiff under the deed from John Howe, Jr., to the plaintiff. The jury are to look back as to the grist-mill, just as it was on the 8th April, 1841, and determine what would be a full supply of water (in high water and low) for it at that time; and if the defendants kept within that limit, and drew water no lower than it was drawn to the grist-mill in 1841, they are not liable, no matter what style of wheels they may have used. If the defendants, during the time covered by the declara-tion, by the change of water wheels, or in the mode of drawing water from the pond to the wheels, or by lowering the place of drawing water from the pond, drew more of the water than, under the agreement of April 8, 1841, the grist-mill had a right to draw, of the water that the machine-shop and furnace rights were entitled to as explained, the plaintiff is entitled to recover.

" If the plaintiff is entitled to recover, it is entitled to recover a fair compensation for the damage done it by the injury recov-ered for, and the length of time between the injury and the trial; and the interest that would accrue on a sum of money equal to the damages during that time, may be considered in estimating the amount of damages the plaintiff is entitled to. If the defend-ants fairly interfered with the rights of the plaintiff to the water, but did no damage that could be estimated, still, the law would imply some damage, and the plaintiff would be entitled to nominal damages. If the defendants drew away the water of the plaintiff, so that the plaintiff could not use it if it would, and the plaintiff would have used it if it could, the plaintiff is entitled to recover

what the water so drawn away would have been worth in the use the plaintiff could have put it to."

In regard to the question of variance raised by the defendants' ninth request, the court, *pro forma*, ruled that there was no variance. To the omission of the court to charge in conformity with the defendants' requests, so far as there was such omission, and to the charge upon the points involved in said requests, so far as the charge is inconsistent therewith, the defendants excepted. In other respects the charge was satisfactory, and the rules of law embraced in the charge above recited, were suitably explained and applied by the court to the testimony in the case.

*Dunton & Veazey* and *J. Prout*, for the defendants.

The plaintiff's grantor, John Howe, Jr., acquired no title to the machine-shop by the deed from Briggs to him. If the Brandon Iron and Car-Wheel Company was a corporation, it would require a vote, either of the stockholders or directors, empowering its agent, Briggs, to execute the deed, in order to make it valid. Gen. Sts. 448, § 3; *Wheelock* v. *Moulton et als.* 15 Vt. 519; *Miller et al.* v. *Rutland & Washington R. R. Co. et al.* 36 Vt. 452; *Arms* v. *Conant et al.* 36 Vt. 744; Angell Corp. §§ 221, 222. If it was a partnership, it would require a power of attorney, executed with all the formalities of a deed, by all the members of the firm, duly recorded, authorizing Briggs to execute the deed. *Oatnam et al.* v. *Fowler*, 43 Vt. 462. There was no evidence in the case of a ratification of this deed by the grantor. Although the plaintiff was in possession of the machine-shop at the time of the alleged injury, its possession did not extend to the water in the stream. There was no title to the flow of the stream in Howe's grantor, beyond the water *actually* and legally *appropriated* to the uses mentioned in the deed from John Conant to John A. and Chauncey W. Conant, and in the indenture of 1841. Therefore there *could* be no possession of the same in the plaintiff that would entitle it to maintain this suit. *Tyler* v. *Wilkinson*, 4 Mason C. C. 397; 4 Abbott's Nat. Dig. 352; 2 Allen, 287; *Buddington* v. *Bradley*, 10 Conn. 213; *Fentiman* v. *Smith*, 4 East. 107; Angell Water Courses, §§ 135 a, 315, 316.

The declaration alleges that the plaintiff was " possessed of a certain machine-shop and water-wheels," &c. ; and the sole injury therein complained of is, that the defendants had so diverted the water as to deprive the plaintiff of the use of the water for its wheel and machinery in said shop. The case shows that several years prior to the injury complained of, the plaintiff's flume, which had formerly conducted the water to the wheel, had gone to decay, the wheel itself had also rotted down or been removed, and the machinery had all been taken from the shop. Therefore the declaration was not supported by the evidence ; and the variance is fatal. *Dewey* v. *Williams*, 43 N. H. 384; Angell Water Courses, § 411 ; *Wilbur* v. *Brown*, Denio, 356.

A purchaser of a mill and privilege is not liable, until after notice, for continuing to use the water to the same extent and in the same manner as his grantor. *Beal* v. *Hadden*, Cro. Jac. 555 ; *Plummer* v. *Harper*, 3 N. H. 88; *Johnson* v. *Lewis*, 13 Conn. 303 ; *Noyes* v. *Stillman*, 24 Conn. 15 ; Angell Water Courses, § 403 ; *Penrudock's* case, 5 Co. 101 ; *Carleton* v. *Redington*, 21 N. H. 291 ; *Snow* v. *Cowles*, 22 N. H. 296 ; *Eastman* v. *Amoskeag Manufacturing Co.* 44 N. H. 143. No notice was given or objections made in this case. On the other hand, it is reasonable to infer that the plaintiff assented to the defendants' use of the water. There are no circumstances from which notice could be inferred ; and if the defendants are liable in this case, one could very ignorantly, under similar circumstances, subject himself to the payment of heavy damages.

As the plaintiff had no means of using the water while the defendants were in possession of the grist-mill, and neither made any attempt to use it, or objected to the use of it by the defendants, the defendants are not liable, and were entitled to a compliance with the 8th request. The owner of a mill is not entitled to damages for a mere theoretical injury to his mill. *Thompson* v. *Crocker*, 9 Pick. 59. The plaintiff and defendants stood towards each other as to the water, in the relation of tenants in common ; and therefore this action cannot be maintained. Angell Water Courses, § 135 a ; *Pratt* v. *Lamson*, 2 Allen, 287.

As the plaintiff had no water-wheel, flume, or machinery in

its shop, and never objected to the use of the water by the defendants while they were in possession of the mill, the plaintiff, if entitled to recover at all under a proper declaration, could only recover nominal damages. *Chatfield* v. *Wilson*, 27 Vt. 670. But there must be an adverse use of the water, to subject a person to the payment even of nominal damages. There was no adverse use in this case, and hence there was no liability therefor on the part of defendants. Angell Water Courses, § 135 a ; *Webb* v. *Portland Manufacturing Co.*, 3 Sumner, C. C. 189.

*E. Edgerton* and *h. J. Phelps*, for the plaintiff.

The plaintiff's title to the machine-shop and its appurtenant water-privilege, is sufficient to sustain this action. It was shown to have been in undisputed possession of the premises, under at least a color and claim of title on record, long before, during, and after the time of the diversion of the water by the defendants for which the suit is brought. It used the water-privilege as long as it could, and till it was rendered useless by the defendants ; and would have continued to use it, as the jury have found, during the period in question, had it not been so rendered useless. This possession is all that is necessary, to support the action against a mere wrong done without title. *Hull* v. *Fuller*, 4 Vt. 199 ; 1 Hilliard Torts, 497, note, 498, and cases cited ; Angell Water Courses, §§ 407, 408, and cases cited.     In the case of *Rogers* v. *Bancroft*, 20 Vt. 250, it was held that in an action for interference with a water-privilege, it was no answer for the defendant to set up an outstanding title in a third person under whom he did not claim. If, therefore, the defendants, instead of raising technical objections against the deed from the Brandon Company to the plaintiff, had affirmatively shown that the title to the water-privileges was still in that company, it would have been no defence, so long as the plaintiff was in possession, and the defendants did not claim under the company.

It is said that the plaintiff, though in possession of the machine-shop, was not in possession of the water, since it was not actually using it during the period covered by the declaration. This is a mistake ; because the water-privilege was an appurtenant to the

land, and would pass by a deed of it. Angell Water Courses, § 153, *et infra*. The occupation of the land was, therefore, that of the water, the latter not being in any adverse possession. And the plaintiff's evidence showed, and the jury have found, that the plaintiff was prevented from actual use of the water during that time, only by the wrongful act of the defendants. This appears from the amount of the verdict, under the instructions as to damages. The deed of the Brandon Company, in whom a complete title is shown, to the plaintiff, accompanied by so long and undisturbed possession under it, is of itself sufficient evidence of title, *prima facie*, and as against a stranger. Upon this possession, and the recitals in the deed, the authority of Mr. Briggs to execute it will be presumed, until impeached.

The objection of variance is without foundation. The evidence fully and fairly supports the declaration. Great nicety is not required. General damages need not be set out at all. And proof of any part of the breach alleged will sustain the action. Courts will lean against such objections. *Hutchinson* v. *Granger*, 13 Vt. 386; *Stearns* v. *Wood*, 17 E. C. L. 76; Angell Water Courses, §§ 413, 414, 415; 8 Grey, 72.*

The opinion of the court was delivered by

REDFIELD, J. This is an action on the case for injuriously diverting water from the plaintiff's machinery in the village of Brandon. On the 1st of May, 1823, John Conant, who was then owner of the whole water-power on both sides of the stream, conveyed two undivided third parts of the land on the east side of the stream, to his two sons, John A. and Chauncey W., together with the buildings thereon, and certain water rights connected therewith. John Conant continued the owner of the grist-mill on the west side of the stream, and the whole water-power thereon, and sold the grist-mill and privilege, March 2, 1852; and on the 31st March, 1866, the title was purchased by the defendants; and from that time to the commencement of this suit, December

---

*That part of the briefs upon the question of the construction to be given to the deed from John Conant to his two sons, and to the indenture of April 8, 1841, is omitted, as the point was not considered by the court.—REPORTER.

8th, 1866, the plaintiff claims the defendants wrongfully diverted the water from the plaintiff's mills and machinery. The exceptions state that the defendants' " mill was used and operated in the ordinary way of operating such mills, from the time defendants acquired the title, until the commencement of this suit, no objection being made thereto by any one ; and no evidence tending to show any negligence or improper management on the part of the defendants during that time, was introduced." The defendants used the water for their grist-mill, from March to December, 1866, with proper care, and in the same manner it had been used by their grantors; and, so far as the case discloses, without complaint that thereby they were working an injury to the plaintiff. Neither party had any proper ownership of the water, but each had a right *to* its use as a motive power *;* and the superior and inferior right, as between the respective owners, was defined and regulated by certain stipulations in the deed of John Conant to his two sons, and by the subsequent mutual covenants between the same parties, of the 8th of April, 1841. By the latter deed, the blast-furnace, while in blast, was entitled to the precedence in the use of the water, and the new grist-mill was entitled to the next use. But, except when there was not a full supply, " all are entitled to the requisite supply."

It must be expected that proprietors of mills and machinery will appropriate to their use useful inventions and improved machinery, when such will render their works more efficient and profitable. The statement of the case would indicate that the Tyler wheel was a great improvement upon the overshot wheel, both in the efficiency of the work and the saving of water ; and while it might require more water while all the machinery was in motion, yet it would do a given quantity of work in less time, and with much less quantity of water. Whether in a succession of days and weeks, it would use and divert more water than the overshot wheel, might, perhaps, be uncertain. If the Tyler wheel, in propelling more machinery than was in use in April, 1841, should for a few hours at a time, use more water than the overshot wheel, and then, by closing the gates, allow the dam to fill, so that, in fact, the power reserved for use on the east side of the

stream would be as much and as beneficial as that reserved when the other wheel was in use, there would seem no good reason for complaint.

By the indenture of April 8, 1841, " in case there is not at any time a full supply of water for the simultaneous operations of the works connected with the dam, the grist-mill shall draw its requisite quantity of water, exclusive of all other works." This exclusive right secured to the new grist-mill, was not merely a right to use the water exclusively, in the manner and for the time it was then accustomed to be used; but a right to use the water in quantity as was then used, and for such length of time during the season of scarcity, as the custom and business of the mill might require. Angell Water Courses, § 149, *et seq.*, and cases there cited. And if the work done by the Tyler wheel in six hours was as much as the overshot wheel would do in twenty-four hours, and with the use of less water, there would seem no infraction of the covenants in the indenture, provided the business done was the same in character as was being done in 1841.

At the time the defendants acquired their title to the grist-mill, the flume and wheel that had been in use to move the machinery on the opposite side of the stream, had rotted away, and could not be used. The defendants operated the grist-mill as it ever had been, and with proper care, and used water which otherwise could be used by no one; and the plaintiff had no flume, wheel, or other appliance by which the water could be used, and no notice or intimation was given the defendants that in " grinding at the mill" they were working mischief to the plaintiff; or that the plaintiff purposed or desired to rebuild its works, and use the water. The declaration avers that the defendants have used the water at their grist-mill " so as unlawfully to deprive the plaintiff of the use of the water from said dam, to operate plaintiff's wheel to said machine shop." The proof is, that during the time alleged, the plaintiff had no wheel to be operated, or flume whereby the water could be conducted from the dam. The act of the defendants did not divert the water from the plaintiff's wheel; did not jostle its action, or stay its motion. It is well settled in actions for flowage, that the grantee of the dam and

mill, by continuing the use of the water and dam, is not liable to an action for flowing thereby the lands above the dam, until notice and request to discontinue the obstruction. In *Noyes* v. *Sullivan*, 24 Conn. 15, HINMAN, J., says: " One purchasing a dam may lawfully use it as it was when purchased, until he has notice to remove it, or not so to use it; and the law has always been held the same since. *Penrudock's* case, 5 Co. 101." In *Johnson* v. *Lewis*, 13 Conn. 303, SHERMAN, J., says : " The rule is very reasonable. The purchaser of property might be subject to great injustice, if he were made responsible for consequences of which he was ignorant, and for damages which he never intended to occasion. They are often such as cannot be easily known, except to the party injured." In *Penrudock's* case, the court resolved that the grantee of premises which has a roof unlawfully projecting over other premises, to the injury of a neighbor, was not liable to damages for continuing the same, until notice and request to remove it. See *Brown* v. *Bowen*, 30 N. Y. 519 ; *Plummer* v. *Harper*, 3 N. H. 88 ; Angell Water Courses, § 403 ; *Carlton* v. *Redington*, 21 N. H. 291 ; *Eastman* v. *Amoskeag Manufacturing Co.*, 44 N. H. 143. In *Brown* v. *Cauga. & Susquehanna Railroad Co.*, 2 Ker. 492, the court, DENIO, J., held a different doctrine, and that " a party that continues a nuisance erected by another, is responsible for the damage caused by its continuance, though he has not been notified to abate it." The doctrine held by this able and learned jurist, as applied to the facts of this case, might be deemed reasonable, without impugning the general rule on this subject. When one keeps up and maintains a nuisance, clearly (if he would use common diligence) or consciously working mischief to another, it is just that he should respond in damages for the injury he has done.

But in this case, so far as the record discloses, the defendants operated their grist-mill prudently. They saw and knew that there was no mill, flume, or machinery that could be moved or used, by water from this dam, on the other side of the stream. And the water in the mill-pond, not used by them, must, necessarily, flow over the dam, or waste. If they had inquired into the history of the matter, they would have learned that in the spring

of 1860, the plaintiff " wholly discontinued the use of machinery in the machine shop, and removed the machinery therefrom." And if they were " compelled " to do this, it was by the act of other parties, and not these defendants. The defendants, therefore, by continuing to use their grist-mill in the ordinary manner, without notice, or reason to believe, that the plaintiff had any purpose or occasion to use the water in the stream, were guilty of no actionable wrong to the plaintiff. There is no doubt that the law will always award some damages for the invasion of a right ; for it is often proper that a right should be vindicated, to arrest the operation of the statute of limitations. But among tenants in common of a water-mill power, neither has any property in the water ; and when one suspends, temporarily, the use of his portion, and the other continues to use from the common reservoir of power what otherwise would waste, there is no presumption of adverse user, but rather of consent and acquiescence.

II.   It is not claimed that the deed of Briggs, as agent, conveyed any title to John Howe, Jr., of the premises claimed by the plaintiff. The plaintiff maintains that it was in lawful possession, with color of title, under the deed from John Howe, Jr., dated April 18, 1864. Four years before that time, the operation of machinery on the premises had been " wholly discontined, and the same removed from the building." The plaintiff was in possession, under color of title, of the brick building, without machinery, wheel, or flume connecting the building with the dam or water, and no appliance for the use of the water. The plaintiff could maintain an action against a stranger for invading his possession, standing upon his possession alone. But the plaintiff was without actual title. The covenants in the indenture of 1841 were not assigned to the plaintiff, and the most the plaintiff can claim is, that it was in possession, with color of title, of the land on which the shop and eastern portion of the dam stand, with no greater right to use the water than the possession of riparian lands gives it. The right to use the water by grant from John Conant to his sons, or that arising from the indenture of 1841, does not appertain to the plaintiff.

If we should concede that the plaintiff might use for mill pur-

poses, as a right appurtenant or incident to its possession, a share of the water on the east side of the stream, as against any having no better right than the plaintiff, that would not be a specific right in any portion of the water which the defendants have, or could, wrongfully appropriate to their use. It is rather a right of user in common with the defendants, and subject to the defendants' superior right to use the water for their grist-mill; and if the defendants should use the whole water in the stream when the plaintiff has no machinery or provision for its use, such user will be presumed to be with the consent and for the benefit of all. The right of riparian proprietors in the use of water upon opposite sides of a stream, is analogous to that of tenants in common. Their interest and right are undivided and in the whole, *per my et per tout;* and if one discontinues the use, and the other continues to use, there is nothing adverse in such act. And such party " does nothing for which an action can be maintained against him, or nominal damages recovered in the assertion of an invaded right." MERRICK, J., in *Pratt* v. *Lamson*, 2 Allen, 275; Angell Water Courses, § 219 b. The defendants have therefore done no tortious act against this plaintiff, for which this action could be maintained.

In the view we have taken of this case, we have no occasion to discuss the legal effect of the deed of John Conant to his two sons, of March 1st, 1823; nor of the indenture between them as to the use of the water, of the 8th of April, 1841.

The judgment of the county court is reversed, and cause remanded.